08 CV 01548

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK




| | |
|---|---|
| THE CANDY JAR, INC., individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NESTLE SUISSE S.A.; NESTLE U.S.A., INC.; NESTLE CANADA INC.; MARS, INCORPORATED; MARS NORTH AMERICA; MARS SNACKFOODS U.S.A. LLC; MARS CANADA INC.; CADBURY SCHWEPPES PLC; CADBURY ADAMS CANADA, INC.; THE HERSHEY COMPANY; HERSHEY CANADA INC.; and ITWAL, LTD.<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, by its attorneys, brings this civil action for damages and injunctive relief on behalf of itself and all others similarly situated against the above-named Defendants, and demanding a trial by jury, complains and alleges as follows:

## INTRODUCTION AND DEFINITIONS

1. Plaintiff, acting on behalf of itself and the putative class of direct purchaser plaintiffs defined herein, sues under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15 and 26) to recover treble damages, to obtain injunctive relief and to recover the costs of suit, including reasonable attorneys' fees, for the injuries that Plaintiff and all others similarly situated sustained as a result of a conspiracy between and among Defendants Nestle, Mars, Cadbury, Hershey and ITWAL, as defined herein, to fix the prices of, and limit price competition with respect to, chocolate confectionery products, in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

2. Plaintiff alleges that the aforementioned conspiracy commenced at least as early as February 1, 2002 and has continued to the present (the "Class Period").

3. As used herein, the term "chocolate confectionery products" means and refers to chocolate and/or products containing chocolate.

## JURISDICTION AND VENUE

4. The Court has jurisdiction over the federal claim under 28 U.S.C. §§1331 and 1337 and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15 and 26).

5. Venue is proper in this District under 15 U.S.C. §§15 and 22 as well as 28 U.S.C. §1391 because Defendants reside, transact business, or are found within this District, and a substantial part of the events giving rise to the claims arose in this District, and because hundreds of class members are located in this District.

6. The activities of the Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have a substantial effect on the foreign and interstate commerce of the United States.

## THE PARTIES

### The Plaintiff

7. Plaintiff The Candy Jar, Inc., a dissolved California corporation, purchased, manufactured and sold chocolate confectionery products at various times during the Class Period. Plaintiff purchased chocolate confectionery products from one or more of the Defendants during the Class Period prior to its dissolution and was injured as a result of Defendants' illegal conduct.

### The Defendants

8. Defendant Nestle Suisse S.A. ("Nestle Suisse") is located at Avenue Nestle 4, CH-1800, Vevey, Vaud, Switzerland. During the Class Period, Nestle Suisse manufactured, marketed, sold and/or distributed chocolate confectionery products to consumers throughout the United States and Canada, directly or through its predecessor, affiliates and/or subsidiaries.

9. Defendant Nestle U.S.A., Inc. ("Nestle USA") is located at 800 North Brand Boulevard, Glendale, California. During the Class Period, Nestle USA manufactured, marketed, sold and/or distributed chocolate confectionery products to consumers throughout the United States and Canada, directly or through its predecessor, affiliates and/or subsidiaries.

10. Defendant Nestle Canada Inc. ("Nestle Canada") is a Canadian corporation with its principal place of business at 25 Sheppard Avenue West, Floors 18-22, North York, Ontario. Nestle Canada is a wholly-owned subsidiary of Nestle Suisse. During the Class Period, Nestle Canada manufactured, marketed, sold and/or distributed chocolate confectionery products to consumers throughout the United States and Canada, directly or through its predecessor, affiliates and/or subsidiaries.

11. Defendants Nestle Suisse, Nestle USA and Nestle Canada are collectively referred to as "Nestle" in the Complaint.

12. Defendant Mars, Incorporated ("Mars Inc.") is a privately-held corporation headquartered at 6885 Elm Street, McLean, Virginia. During the Class Period,

Mars Inc. manufactured, marketed, sold and/or distributed chocolate confectionery products to consumers throughout the United States and Canada, directly or through its predecessor, affiliates and/or subsidiaries.

13. Defendant Mars North America ("Mars North America") is headquartered at 800 High Street, Hackettstown, New Jersey. During the Class Period, Mars North America manufactured, marketed, sold and/or distributed chocolate confectionery products to consumers throughout the United States and Canada, directly or through its predecessor, affiliates and/or subsidiaries.

14. Defendant Mars Snackfoods U.S.A. LLC ("Mars Snackfoods") is headquartered at 800 High Street, Hackettstown, New Jersey. During the class period, Defendant Mars Snackfoods manufactured, marketed, sold and/or distributed chocolate confectionery products to consumers throughout the United States and Canada, directly or through its predecessor, affiliates and/or subsidiaries.

15. Defendant Mars Canada Inc. ("Mars Canada") is a Canadian corporation with its principal place of business at 37 Holland Drive, Bolton, Ontario. Mars Canada is the Canadian division of Mars Inc. During the Class Period, Mars Canada manufactured, marketed, sold and/or distributed chocolate confectionery products to consumers throughout the United States and Canada, directly or through its predecessor, affiliates and/or subsidiaries.

16. Defendants Mars Inc., Mars North America, Mars Snackfoods and Mars Canada are collectively referred to as "Mars" in the Complaint.

17. Defendant Cadbury Schweppes PLC ("Cadbury Schweppes") is located at 25 Berkeley Square, London, England. During the Class Period, Cadbury Schweppes manufactured, marketed, sold and/or distributed chocolate confectionery products to consumers throughout the United States and Canada, directly or through its predecessor, affiliates and/or subsidiaries.

18. Defendant Cadbury Adams Canada, Inc. ("Cadbury Canada") is a Canadian corporation with its principal place of business at 5000 Yonge Street, Suite 2100,

Toronto, Ontario. Cadbury Canada is a subsidiary of defendant Cadbury Schweppes. During the Class Period, Cadbury Canada manufactured, marketed, sold and/or distributed chocolate confectionery products to consumers throughout the United States and Canada, directly or through its predecessor, affiliates and/or subsidiaries.

19. Defendants Cadbury Schweppes and Cadbury Canada are collectively referred to as "Cadbury" in the Complaint.

20. Defendant The Hershey Company ("Hershey Co.") is located at 100 Crystal A Drive, Hershey, Pennsylvania. During the Class Period, Hershey Co. manufactured, marketed, sold and/or distributed chocolate confectionery products to consumers throughout the United States and Canada, directly or through its predecessor, affiliates and/or subsidiaries.

21. Defendant Hershey Canada Inc. ("Hershey Canada") is a Canadian corporation with its principal place of business at Airport Corporate Centre, 5750 Explorer Drive, Suite 500, Mississauga, Ontario. During the Class Period, Hershey Canada manufactured, marketed, sold and/or distributed chocolate confectionery products to consumers throughout the United States and Canada, directly or through its predecessor, affiliates and/or subsidiaries.

22. Defendants Hershey Co. and Hershey Canada are collectively referred to as "Hershey" in the Complaint.

23. Defendant ITWAL Ltd. ("ITWAL") is an organization comprised of wholesale and retail distributors with its principal place of business at 440 Railside Drive, Brampton, Ontario. During the class period, ITWAL was aware of, coordinated, and facilitated the unlawful conspiracy alleged in the Complaint.

24. Defendants Nestle, Mars, Cadbury, Hershey and ITWAL are referred to collectively as "Defendants" in the Complaint.

**Co-Conspirators**

25. Various others, presently unknown to Plaintiff, participated as co-conspirators with the Defendants in the violations of law alleged in this Complaint and have engaged in conduct and made statements in furtherance thereof.

26. The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's business or affairs.

27. Each of the Defendants named herein acted as the agent or joint venturer of or for the other Defendants with respect to the acts, violations and common course of conduct alleged herein.

**CLASS ACTION ALLEGATIONS**

28. Plaintiff brings this suit as a class action pursuant to the Federal Rules of Civil Procedure 23(a) and 23(b)(2), on behalf of a class composed of and defined as follows ("the Class"):

> All persons and entities who, at any time from at least as early as February 1, 2002 through the present (the "Class Period"), directly purchased chocolate confectionery products from the Defendants for use or delivery in the United States. Specifically excluded from this Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

29. This action has been brought and may be properly maintained as a class action pursuant to Rules 23(b(2) and 23(b)(3) of the Federal Rules of Civil Procedure for the following reasons:

a. Based upon the nature of the trade and commerce involved and the number of direct purchasers of chocolate confectionery products, Plaintiff believes that the members of the Class number in the thousands and are geographically dispersed

across the country so that that joinder of all Class members is not practicable; the identities of the members of the Class are not now known to Plaintiff but can be readily learned from Defendants' books and records and through other means of notification;

b. Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff directly purchased chocolate confectionery products from one or more of the Defendants or their co-conspirators, and therefore Plaintiff's claims arise from the same common course of conduct giving rise to the claims of the members of the Class and the relief sought is common to the Class;

c. The following common questions of law or fact, among others, exist as to the members of the Class:

i. whether Defendants formed and operated a combination or conspiracy to fix, raise, maintain or stabilize the prices of, or allocate the market for, chocolate confectionery products;

ii. whether the combination or conspiracy caused prices of chocolate confectionery products to be higher than they would have been in the absence of Defendants' conduct;

iii. the operative time period of Defendants' combination or conspiracy;

iv. whether Defendants' conduct caused injury to the business or property of Plaintiff and the members of the Class;

v. the appropriate measure of the amount of damages suffered by the Class;

vi. whether Defendants' conduct violates Section 1 of the Sherman Act; and

vii. the appropriate nature of class-wide equitable relief.

d. These and other questions of law or fact which are common to the members of the Class predominate over any questions affecting only individual members of the Class;

e. Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff has no interests that are antagonistic to other members of the Class and has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent itself and the Class;

f. A class action is superior to other available methods for the fair and efficient adjudication of this litigation since individual joinder of all damaged Class members is impractical. The damages suffered by individual Class members are relatively small, given the expense and burden of individual prosecution of the claims asserted in this litigation. Thus, absent the availability of class action procedures, it would not be feasible for Class members to redress the wrongs done to them. Even if the Class members could afford individual litigation, the court system could not. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, the class action device presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court;

g. Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole; and

h. In the absence of a class action, Defendants would be unjustly enriched because they would be able to retain the benefits and fruits of their wrongful conduct.

**NATURE OF TRADE AND COMMERCE**

30. "Chocolate" comprises a number of raw and processed foods that are made from beans that are found within pods that grow on tropical cacao trees. The pods are

first harvested and the beans and surrounding pulp are then extracted from the pods and fermented. The extracted beans are then dried, graded and roasted. The shells of the beans are subsequently removed and the "nibs" are extracted. The nibs, which are comprised largely of cocoa butter, are then processed into either a liquid form known as "cocoa liquor" or a solid form known as "cocoa mass." The cocoa liquor and cocoa mass are then mixed with other ingredients in order to make different types of chocolate.

31. The chocolate confectionery market in the United States is very large. American consumers buy about $13 billion worth of chocolate a year, according to Susan S. Smith, spokeswoman for the National Confectioners Association.

32. Defendants, taken as a whole, hold a market share in the United States approaching 90%, which is conducive to the type of collusion alleged herein, as there are a small number of market participants and those participants have a large market share. Specifically, Defendants have approximately the following market share of the U.S. market for chocolate confectionery products: Hershey 47%, Mars 31%, and Nestle 12%. Likewise, Defendants Hershey, Mars, Nestle and Cadbury collectively have approximately 64% of the Canadian market for chocolate confectionery products.

33. Because of their high collective market share in the U.S. and Canada, Defendants collectively are able to exercise market power in each of these markets, including the ability to raise prices and erect barriers to entry.

34. There are high barriers of entry to the chocolate confectionery products market. The U.S. and Canadian chocolate markets are mature markets that require a great deal of technical knowledge and capital in order to formulate, manufacture, market and distribute chocolate confectionery products.

**DEFENDANTS' ILLEGAL CONDUCT**

35. Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which was to raise the prices at which they sold

chocolate confectionery products to artificially inflated levels from at least February 1, 2002 through the present.

36. In December 2007, an article published in the Wall Street Journal revealed that approximately one month earlier "Canadian regulators began an investigation into allegations that the Canadian divisions of Hershey Co., Cadbury Schweppes PLC, Mars Inc. and Nestle SA fixed prices..." (December 21, 2007 edition of the Wall Street Journal, *Chocolate Makers Face Probe Over Pricing*.)

37. The same article stated that "Ontario's Superior Court of Justice on Nov. 21 granted search warrants to be issued to all of those candy makers 'based on evidence that there are reasonable grounds to believe that a number of suppliers in the chocolate confectionery industry have engaged in activities contrary to the conspiracy provisions of the Competition Act,' a spokeswoman for Canada's Competition Bureau said in a statement last month." (December 21, 2007 edition of the Wall Street Journal, *Chocolate makers Face Probe over Pricing*.)

38. An article published the next day in the Wall Street Journal discussed investigation-specific evidence of secret meetings and collusion on price uncovered by the Canadian Competition Bureau. For example: "According to the affidavits, one unidentified witness gave investigators a lengthy account involving Nestle Canada Chief Executive Robert Leonidas. The witness claimed he was approached by Mr. Leonidas during the Confectionery Manufacturers Association of Canada annual meeting in June 2005. This person said that Mr. Leonidas 'said words to the effect of "We are going to take a price increase and I want you to hear it from the top.'" According to the affidavit, Mr. Leonidas then handed the person an envelope. The witness told authorities that Mr. Leonidas 'would have left the meeting with the idea that the [witness's company] would follow a price increase led by Nestle,' the affidavit says." (December 22, 2007 edition of the Wall Street Journal, *Chocolate Probe Cites Canadian Pricing*.)

39. In furtherance of this plan, "The witness opened the envelope sometime after meeting with Mr. Leonidas, the affidavit says. Asked by a Competition Bureau lawyer why he didn't open the envelope immediately, the witness said, 'Because you shouldn't talk about pricing. I didn't want to be rude to Bob, so I said OK, was neutral, but I didn't want him to think, in any way, that I was coordinating with him.' The witness said the envelope contained a document about Nestle's planned price increase on chocolate in 2005." (December 22, 2007 edition of the Wall Street Journal, *Chocolate Probe Cites Canadian Pricing*.)

40. The same article provided details of another meeting: "On July 6, 2005, the witness told his assistant to go to Mr. Leonidas's office to pick up something, the account continues. The assistant went to an unspecified Nestle office in Canada and was met by Mr. Leonidas downstairs. 'He said something to the effect that it was better not to be seen in his office and handed [the assistant] an envelope,' the affidavit says. This envelope also contained information about a planned price increase by Nestle. The company that came forward to Canadian authorities announced an average price increase of 5.2% for its chocolates effective Oct. 31, 2005, the affidavit says. 'The price increase ... was such as to align its prices on a number of common formats with those of Nestle,' the affidavit says. Hershey and Mars quickly followed suit, the affidavit says." (December 22, 2007 edition of the Wall Street Journal, *Chocolate Probe Cites Canadian Pricing*.)

41. The article further stated: "Discussions over price-fixing continued, according to the affidavits. Last July, a different witness for the company met Sandra Martinez de Arevalo, president of Nestle Canada's confectionery business, for lunch at Auberge du Pommier, a restaurant in Toronto, the affidavit says. According to the witness's account, Ms. Martinez suggested that the witness's company 'lead a price increase in 2007, as Nestle wanted to take a price increase in the third quarter.' The witness said he answered that his company wasn't prepared to take a price increase in 2007, but might in 2008. Another witness said he was approached on Sept. 27 by Eric Lent, General Manager of Hershey

Canada, at a trade association meeting. As he was getting ready to sit down at the dinner table, this witness said, Mr. Lent approached him and said Nestle was 'taking a price increase' and 'so we should take advantage' or 'we should increase our prices too,' according to the affidavit. According to the court document, Mr. Lent continued: 'Bob [Leonidas] and I talk about it all the time. It's public knowledge that Nestle is taking its prices up.'" (December 22, 2007 edition of the Wall Street Journal, *Chocolate Probe Cites Canadian Pricing*.)

42. According to an Associated Press article, *Court Documents Allege Canadian Chocolate Companies Involved in Price-Fixing Scheme*, dated December 23, 2007: "Court documents in the case, unsealed by an Ottawa judge Friday, allege that senior executives at Hershey Canada Inc., Mars Canada Inc. and Nestle Canada Inc. met secretly in coffee shops, restaurants and at industry conventions to set prices. ... The documents allege the chief executive of Nestle Canada handed envelopes stuffed with pricing information to a competitor, instructing the person not to be seen picking up the material in his office. ITWAL's president also allegedly sent regular updates to participants. ... The alleged collusion is reported to have begun in February 2002, and continued until a few weeks ago."

43. The documents unsealed in Ottawa revealed that Defendants, through their officers, directors and employees, effectuated an unlawful contract, combination, trust or conspiracy between themselves and their co-conspirators by, among other things:

a. participating in meetings and conversations, including through various trade associations and committees, to discuss the prices of chocolate confectionery products;

b. agreeing, during those meetings and conversations, to charge prices at specified levels and otherwise to increase and maintain prices of chocolate confectionery products;

c. issuing price announcements and quotations in accordance with the agreements reached; and

d. selling chocolate confectionery products to various customers at non-competitive prices.

44. The Canadian Competition Bureau obtained the above evidence, along with significant additional and corroborative evidence from a "Cooperating Party" under an immunity program. This evidence, and the Bureau's detailed investigation, caused the Bureau to make the following statement on November 19, 2007:

> a. Hershey [Canada Inc.], Mars [Canada Inc.], Nestle [Canada Inc.] and other persons known and unknown, during the period commencing at least as early as February 2004, and continuing until the present, the exact dates being unknown, did conspire, combine, agree or arrange with each other and with the Cooperating Party to enhance unreasonably the price, and to unduly prevent or lessen competition in the supply, of chocolate confectionery products in Canada, and did thereby commit an indictable offense contrary to paragraphs 45(l)(b) and(c) of the Competition Act, RSC 1985, c C-34.
>
> b. The alleged conspiracy arises from communications between employees of the Cooperating Party, Hershey [Canada Inc.], Mars [Canada Inc.], Nestle [Canada Inc.] and others known and unknown, who exchanged confidential pricing information. The information reveals a pattern of communications via email, telephone, private meetings and meetings on the margins of industry association conferences, from at least February 2004 to the present. The relevant industry associations are the Confectionery Manufacturers Association of Canada ("CMAC") and the Food and Consumer Products of Canada ("FCPC"). Information obtained by the Commissioner provides reason to believe that the abovementioned parties entered an agreement or arrangement to fix prices and control discounts relating to the supply of chocolate confectionery products in Canada contrary to paragraphs 45(l)(b) and 45(l)(c) of the Act. The Commissioner has been aware of the matter after a participant in these alleged offenses (the "Cooperating Party") approached the Bureau under its Immunity Program.
>
> c. Cooperating Individual 1 indicated that he participated in a breakfast meeting with the President [and CEO] of Nestle [Canada Inc.], Bob Leonidas, on February 23, 2004. During the meeting, one topic of discussion was trade spend (the industry practice of providing discounts, rebates and allowances to customers, often linked to promotions). Cooperating Individual 1 indicated that it was known in the industry that he disagreed with the industry's prevailing approach to trade spend and that the Cooperating Party was going to reduce trade spend on chocolate. Cooperating Individual 1 indicated that he left the meeting with the impression that Leonidas "sees the world the way" that he did. Cooperating Individual 1 also understood that he had an open line to call Leonidas if there were any issues in the market, including trade spend practices. The Cooperating Party also has provided the Bureau with a copy of a calendar entry dated February 23, 2004 and a receipt from the breakfast restaurant, corroborating that the meeting took place.
>
> d. Counsel for the Cooperating Party provided the Bureau with a copy of internal email exchange starting on June 1, 2005 and relating to a

discussion with their customer, ITWAL Limited, a distributor. Cooperating Individual 11 sent an email with the subject heading "Chocolate pricing" to Cooperating Individual 12 and Cooperating Individual 13 stating: "At ITWAL I was informed by a reliable source that both Nestle and Effem have been to customers hinting at 2005 price increases. No details or confirmation. I suggested that we would seriously consider appropriate actions once firm details known, and that I would be concerned about the other leading player not following which my contact said they would inquire about. This is similar to info we had picked up a couple of months ago. Martin I would send out a note to ADM's to start digging."

e. Cooperating Individual 1 met Leonidas at Manoir Richelieu—during [an industry] annual meeting held June 2-5, 2005. Leonidas sought out Cooperating Individual 1 and they had a short meeting. Cooperating Individual 1 stated that Leonidas said words to him the effect of "I want you to hear it from the top—I take my pricing seriously" or "We are going to take a price increase and I want you to hear it from the top." Leonidas handed Cooperating Individual 1 an envelope. Cooperating Individual 1 accepted the envelope without objection. Cooperating Individual 1 said, "I may have said 'we like to take pricing too, we take it seriously.' I don't think [Leonidas] took a negative impression. I just don't known if he thought it was favorable." Cooperating Individual 1 agreed that Leonidas would have left the meeting with the idea that the Cooperating Party would follow a price increase led by Nestle [Canada Inc.].

f. Counsel for the Cooperating Party provided the Bureau with a copy of an email exchange dated July 6, 2005 indicating that by at least that date a letter containing confidential Nestle [Canada Inc.] price increase information was circulating around the Cooperating Party's office. One of the emails observed that the letter was a draft, as it was dated July 15, 2005, was unsigned, and contained spelling mistakes. The information was that Nestle was increasing the price of its confectionery portfolio by approximately 5 to 7%, effective October 31, 2005 for base confectionery and April 18, 2006 for seasonal confectionery. This pricing information was discussed among the Cooperating Party's leadership team and prompted the Cooperating Party to consider and announce a price increase on chocolate. The Cooperating Party has also provided the Bureau with a copy of a letter located in its files that appears to be the July 15 letter.

g. Cooperating Individual 2 stated that Cooperating Individual 1 called her on July 6, 2005 from Europe and instructed her to go to the Nestle [Canada Inc.] offices to pick up something from Leonidas. Cooperating Individual 2 got Leonidas' phone number from Cooperating Individual 1's contacts and called Leonidas to arrange a time. Cooperating Individual 2 went to the Nestle [Canada Inc.] offices with a colleague and was met by Leonidas downstairs. He said something to the effect that it was better not to be seen in his office and handed Cooperating Individual 2 an envelope. Cooperating Individual 2 subsequently opened the envelope and it contained information about a planned price increase by Nestle [Canada Inc.] Counsel for the Cooperating Party provided the Bureau with a copy of the document that Cooperating Individual 2 had retrieved from the files and Cooperating Individual 2 believes it is the document that was contained in the envelope from Leonidas. The document is an unsigned letter on Nestle letterhead announcing a chocolate price increase to the trade and was forward dated July 19, 2005. The July 19 letter is substantively the same as the July 15 letter, except that spelling

mistakes had been corrected and the percentage price increase had been increased to "5 to 8%."

h. Cooperating Individual 2 said that when she returned to the office on July 6, 2005, she called Cooperating Individual 1 in Europe, as he had requested, and left a voice-mail reading the contents of the letter. Cooperating Individual 2 also states that she sent an email message to Cooperating Individual 1 informing him that she had left him a voice-mail regarding the Nestle letter. The Cooperating Party has provided the Bureau with a copy of an email from Cooperating Individual 2 to Cooperating Individual 1 dated July 6, 2005 that states "Sent voice-mail re Nestle letter."

i. Regarding the email from Cooperating Individual 2 dated July 6, 2005, Cooperating Party 1 explained that earlier that day he had received a confirmation on voice-mail that Nestle [Canada Inc.] was going to have a price increase. Cooperating Individual 1 thinks he sent a voice-mail or email message to Cooperating Individual 2 and asked her to forward the message by voice-mail to others in the Cooperating Party along the lines of "If Nestle is going to take a price increase then we will too."

j. Counsel for the Cooperating Party provided the Bureau with a price increase letter from the Cooperating Party dated July 29, 2005. The Cooperating Party announced a price increase on average of 5.2% on its chocolate portfolio, effective October 31, 2005. The price increase for the Cooperating Party was such as to align its prices on a number of common formats with those of Nestle [Canada Inc.]

k. Counsel for the Cooperating Party provided the Bureau with a Hershey [Canada Inc.] price increase letter dated August 23, 2005 that was located in the files of Cooperating Party. Hershey [Canada Inc.] announced a price increase of an unknown percentage on most chocolate and candy products effective October 31, 2005.

l. Counsel for the Cooperating Party provided the Bureau with a Mars [Canada Inc.] price increase letter dated September 6, 2005. Mars [Canada Inc.] announced a price increase on average of 6% on select items in its confectionery portfolio, effective November 7, 2005.

m. Counsel for the Cooperating Party stated that Cooperating Individual 3 was contacted by Nestle [Canada Inc.] employee Lynn Hashinsky in late fall 2005 regarding pricing at a key account. Cooperating Individual 3 reported this to the Cooperating Party's in-house counsel who in turn informed Cooperating Individual 1 of the incident.

n. Counsel for the Cooperating Party provided the Bureau with a copy of an email exchange between Leonidas and Cooperating Individual 1 beginning on January 18, 2006. Cooperating Individual 1 congratulated Leonidas on his promotion to President and CEO of Nestle [Canada Inc.]. Leonidas responded on January 19, 2006: "Thanks [first name of Cooperating Individual 1], still want to see you Feb 7th 8 am to TALK."

o. Counsel for the Cooperating Party provided the Bureau with a copy of an entry from Cooperating Individual 1's calendar dated February 15, 2006 showing a meeting scheduled for 7:30 am with Leonidas at a Second Cup coffee shop. Cooperating Individual 1 met Leonidas in February 2006 at a

Second Cup coffee shop in Toronto. During this meeting they discussed the price of seasonal chocolate. Leonidas said he wanted Cooperating Individual 1 to take a price increase. Cooperating Individual 1 states that he refused to commit to taking a price increase. On October 30, 2006, the Cooperating Party announced a price increase on seasonal chocolate to take effect February 5, 2007—5% for Halloween products and 4% for Easter products.

p. Cooperating Individual 1 received a phone call from the new President of Nestle Confectionery, Sandra Martinez de Arevalo, in mid 2007. Martinez wanted to meet and talk. Cooperating Individual 1 and Martinez met for lunch at Auberge du Pommier on July 4, 2007 in Toronto. The discussion covered a number of issues, both personal and professional. Martinez suggested that the Cooperating Party lead a price increase in 2007, as Nestle wanted to take a price increase in the third quarter. Cooperating Individual 1 replied that he was not prepared to take a price increase in 2007, but indicated that the Cooperating Party might take one in 2008. Cooperating Individual 1 said he would follow on chocolate but not lead. Martinez said she would call him back in two weeks.

q. Cooperating Individual 1 said that he was of the view that the discussion did not matter because he was leaving the Cooperating Party; he could lead her down the garden path because he would not be making the decisions. Martinez could "say whatever she wants and hear whatever she wants" because Cooperating Individual 1 would not be making pricing decisions. Cooperating Individual 1 also states that Martinez would have understood that "they were on the same page." Counsel for the Cooperating Party provided the Bureau with a copy of the receipt and expense report for the lunch on July 4, 2007.

r. Cooperating Individual 5 received a call from Nestle [Canada Inc.] employee Steve Morris on July 5, 2007. Morris told Cooperating Individual 5 that Nestle [Canada Inc] was thinking about taking a price increase in early March 2008. Cooperating Individual 5 said that the Cooperating Party was thinking of taking a price increase too. They also discussed that if Nestle [Canada Inc.] and the Cooperating Party took a price increase, Mars would probably follow too. Cooperating Individual 5 provided this information to his supervisor, Cooperating Individual 6, Cooperating Individual 7 and Cooperating Individual 8. Cooperating Individual 8 informed in-house counsel of the Cooperating Party, who in turn informed Cooperating Individual 1.

s. Martinez left a voice mail for Cooperating Individual 1 on August 30, 2007, stating that she wanted to say goodbye before he left the Cooperating Party and requested a meeting with him the week of September 11 to 14. Cooperating Individual 1 believes that Martinez wanted to meet to follow up on the pricing discussions that took place on July 4, 2007. This meeting never occurred due to scheduling issues. Counsel for the Cooperating Party provided the Bureau with a transcribed copy of the voice-mail that was sent by Martinez to Cooperating Individual 1 on August 30, 2007.

t. Counsel for the Cooperating Party informed Andrew Burke that on September 19, 2007, both Cooperating Individual 1 and Leonidas were in Vancouver attending an event hosted by Overwaitea, a mutual customer. Cooperating Individual 1 said that during this event, Leonidas encouraged Cooperating Individual 1 to attend an upcoming meeting of the FCPC [Food & Consumer Products of Canada]. Leonidas said that it was "public news" that

Nestle [Canada Inc.] was taking a price increase in February 2008 of 4-6% on everything and that they had told their customers. Cooperating Individual 1 did not reply and Leonidas said to him words to the effect of "You don't need to say anything." Leonidas also encouraged Cooperating Individual 1 to contact Martinez.

u. In emails dated November 7, 2005, February 27, 2006 and February 6, 2007, Cooperating Individual 4 refers to discussions with Martin Lebel, an employee of Effem (now Mars Canada Inc.). In the November 7, 2005 email, Cooperating Individual 4 referred to a discussion with Lebel related to Mars [Canada Inc.]'s "dead net cost" on chocolate singles and trade spend issues. In the February 27, 2006 email, Cooperating Individual 4 referred to a discussion with Lebel about the level of margins on certain chocolate products. In the February 6, 2007 email, Cooperating Individual 4 referred to a discussion with Lebel indicating that Cooperating Individual 4 obtained information from Effem and Hershey [Canada Inc.] about presentations made to one of their common customers.

v. Counsel for the Cooperating Party provided the Bureau with a copy of an email sent on January 3, 2007 by Bert Alfonso, now Senior Vice President and Chief Financial Officer of The Hershey Company in the USA, to both Lent and Cooperating Individual 1. The email included the following statement: "As we discussed, Hershey has recently appointed Eric Lent as VP/GM for the Canada business. In keeping with the good advice from 'The Godfather,' keep close to your competition, I am including contact info below in an effort to introduce you both. All kidding aside, I know Eric is looking forward to meeting you." Subsequent email communications between Lent and Cooperating Individual 1 on January 3, 2007 set up a phone call between the two for 3:30 on January 4, 2007.

w. Counsel for the Cooperating Party provided the Bureau with a copy of an email sent on March 15, 2007 by Lent to Cooperating Individual 1 with the subject heading "Interesting times" and the text, "I'm back in town the week after next. Let's get together!"

x. Cooperating Individual 9 first met Lent at a dinner hosted by the FCPC trade association at Niagara-on-the-Lake on September 27, 2007. As he was getting ready to sit down at a dinner table, Cooperating Individual 9 was approached by Lent. Lent said words to the following effect to Cooperating Individual 9: "Hey [Cooperating Individual 9], welcome back to Canada. Congratulations on your new job. Hey, by the way, Nestle is taking a price increase." Lent continued with either "So we should take advantage" or "we should increase our prices too." Cooperating Individual 9 replied either "We should not be having this conversation" or "I am not comfortable having this conversation." Lent continued: "Don't worry we can talk about it. Bob and I talk all the time [Lent pointed to an individual that Cooperating Individual 9 later identified as Bob Leonidas, President of Nestle [Canada Inc.]. It's public knowledge that Nestle [Canada Inc.] is taking its prices up." Cooperating Individual 9 contacted a member of the Cooperating Party's in-house counsel after the dinner and left a message detailing the conversation.

y. Cooperating Individual 9 received a message from Lent on October 17, 2007 requesting a meeting. That same day, Cooperating Individual 9 sent an email reply to his assistant, and also the assistant general counsel for the Cooperating Party, adding the comment "our friend at Hershey

[Canada Inc.] seems to need a reminder re: Competition Act." On October 19, 2007, counsel for the Cooperating Party brought this issue to the Bureau's attention in light of its obligations under the Immunity Program.

45. On November 28, 2007, the Canadian Competition Bureau further stated the following:

a. Hershey [Canada Inc.], ITWAL, Mars [Canada Inc.], Nestle [Canada Inc.] and other persons known and unknown, during the period commencing at least as early as February 2002, and continuing until the present, the exact dates being unknown, did conspire, combine, agree or arrange with each other and with the Cooperating Party to enhance unreasonably the price, and to unduly prevent or lessen competition in the supply, of chocolate confectionery products in Canada, and did thereby commit an indictable offense contrary to paragraphs 45(1)(b) and (c) of the Competition Act, RSC 1985, c C-34.

b. ITWAL, while engaged in the supplying of chocolate confectionery products, during the period commencing as early as February 2002, and continuing until at least February 2004, the exact dates being unknown, did by agreement, threat, promise or like means, attempt to influence upward, or to discourage the reduction of, the price at which Cadbury [Adams Canada Inc.], Hershey [Canada Inc.], Mars [Canada Inc.] and Nestle [Canada Inc.] supplied or offered to supply or advertised chocolate confectionery products within Canada, and did thereby commit an indictable offense contrary to paragraph 61(1)(a) of the Competition Act, RSC 1985, c C-34.

c. ITWAL during the period commencing as early as February 2002, and continuing until at least February 2004, the exact dates being unknown, did by threat, promise, or like means, attempt to induce suppliers, namely Cadbury [Adams Canada Inc.], Hershey [Canada Inc.], Mars [Canada Inc,] and Nestle [Canada Inc.], as a condition of ITWAL doing business with the suppliers, refuse to supply chocolate confectionery products to a particular person or class of persons because of the low pricing policy of that person or class of persons, and did thereby commit an indictable offense contrary to subsection 61(6) of the Competition Act, RSC 1985, c C-34.

d. The alleged conspiracy arises from communications between employees of the Cooperating Party, Hershey [Canada Inc.], Mars [Canada Inc.] and Nestle [Canada Inc.], ITWAL and others known and unknown, who exchanged confidential pricing information. The information reveals a pattern of communications via email, telephone, private meetings and meetings on the margins of industry association conferences, from at least February 2002 to the present. The relevant industry associations are the Confectionery Manufacturers Association of Canada ("CMAC") and the Food and Consumer Products of Canada ("FCPC"). Information obtained by the Commissioner provides reason to believe that the above mentioned parties entered an agreement or arrangement to fix prices and control discounts relating to the supply of chocolate confectionery products in Canada contrary to paragraphs 45(1)(b) and 45(1)( c) of the Act, and that ITWAL has engaged in price maintenance contrary to section 61 of the Act. The Commissioner has been aware of the matter after a participant in these alleged offenses (the "Cooperating Party") approached the Bureau under its Immunity Program.

e. There was a course of communications, both direct and indirect, about trade spend for chocolate confectionery products between ITWAL, Cadbury [Adams Canada Inc.], Hershey [Canada Inc.], Mars [Canada Inc.], Nestle [Canada Inc.] and others commencing at least as early as February 2002 and continuing until at least October 2003. It is the Bureau's opinion that this course of communications was for the purpose of eliminating, controlling or reducing trade spend in the chocolate confectionery industry.

f. The filing cabinet in the office of Elizabeth Cloran, assistant to Ross Robertson, the Vice President and General Manager, and Glenn Stevens, the President and CEO of ITWAL, contained letters dated February 21, 2002 from Stevens addressed to each of Bob Leonidas (Nestle [Canada Inc.]), Rick Meyers (Hershey [Canada Inc.]), Don Robinson (Mars [Canada Inc.]), and Arthur Soler (Cadbury [Adams Canada Inc.]). The letters are substantively the same and the following statement is taken from the letter to Nestle [Canada Inc.]: "At the 'end of the day,' it is only the suppliers' control and discipline of trade spending that can restore functionality of the marketplace. The problem is very serious and completely out of control on the part of the suppliers. I am being forced to reexamine how we operate in the market and I am not sure it would be in the best interests of Nestle. I urge you to meet and take action before this chocolate bar 'bubble bursts.'"

g. A folder labeled "TAN [Take Action Now] notices" was found in a filing cabinet in the office of Ms. Cloran and contained a number of letters from ITWAL addressed to various persons including employees of Cadbury [Adams Canada Inc.], Hershey [Canada Inc.], Mars [Canada Inc.] and Nestle [Canada Inc.].

h. The TAN notices folder contained a "TAN Information Bulletin" dated March 7, 2002. Accompanying the TAN Information Bulletin was a fax cover sheet to each of Bob Leonidas (Nestle [Canada Inc.]), Rick Meyers (Hershey [Canada Inc.]), Don Robinson (Mars [Canada Inc.]), and Arthur Soler (Cadbury [Adams Canada Inc.]). The faxes were all in substantively similar terms. The fax to Cadbury [Adams Canada Inc.] contains the following statement: "Further to my letter of February 21, 2002, please find attached information forwarded by Members on product and pricing available from diverters. In view of the seriousness of the problem, I will forward information as received under the acronym, T.A.N., which stands for 'TAKE ACTION NOW!' I trust you will accept the information in the spirit with which it is intended. I look forward to meeting with you to learn what steps Cadbury is taking to address this problem." D. Glenn Stevens.

i. The TAN notices folder contained a "TAN Information Bulletin #4" dated April 5, 2002 containing the following statement: "Although 1 don't want to overreact too soon, it appears your efforts to 'dry up' this activity may be starting to work! ... I want to take this opportunity to thank each of you for responding to our TAN initiative. It is very positive and encouraging already. That being the case, I want to share with you some of the information that has been discussed and the commitments given. 1. Potential gray marketers have been identified and, in some cases, cut off. Others have had their volumes reviewed and capped or monitored in the situations where buying through a distributor. ... 2. We feel that part of the solution is that vending customers should not be sold direct and our recommended 'floor price model' will resolve it. 3. I am pleased to hear from you that in some cases, an ongoing internal audit procedure has been set up to monitor account activities with respect to

purchases and movement—some of you have hired a third party investigator with results already being achieved. 4. Thank you for your agreement to review. Clean this up and it allows you to clean up the allowances on street dealing through the full-service wholesalers. 5. I also want to thank you for putting in writing your serious concerns about this entire situation and the fact that your representatives are subject to immediate termination if trade spending policies are not adhered to accordingly. Together we can correct this destabilizing, dysfunctional and unprofitable practice. Let's get it done. T.A.N." Bulletin #4 was accompanied by fax cover sheets dated April 5, 2002 to each of Soler, Robinson, Meyers, Leonidas, Tim Mason (Cadbury [Adams Canada Inc.]), Roy Benin (Mars [Canada Inc.]), Ross Robertson [Hershey Canada Inc.], and Matt Hall (Nestle [Canada Inc.]).

j. The TAN notices folder contained a "Bulletin #15" dated December 12, 2002 containing the following statement: "To Whom it May Concern, First of all, I would like to extend congratulations to you all as we wind up the year with respect to your concerted and committed efforts to clean up the dysfunctional retail trade spending. Your efforts can clearly be seen in the following areas: 1) Significantly less diversion of bars re: back door at retail grocery, dollar stores, vending; 2) Reduced unreasonably low retail prices, i.e. 2/99¢ or 3/99¢ (Although I ask you to remain vigilant—see attached 2/99¢ on Kit Kat and Caramilk at Maxi recently). In talking to each of you, I understand that there is a renewed effort to invest in brands and restore the profitability of this category. This is good news and we share your enthusiasm. Functional trade spending criteria combined with top management discipline, oversight and measurement can achieve this objective in 2003. We are proud as full service distributors to be your partner in this endeavor and look forward to winning together! In closing, we wish everyone a Happy Holiday Season and a fantastic and prosperous New Year! T.A.N." Bulletin #15 was accompanied by fax cover sheets dated April 5, 2002 to each of Robinson, Meyers, Leonidas, Mason, Benin, Robertson, Hall, Peter Allen (Cadbury [Adams Canada Inc.]), Doug Tyler (Cadbury [Adams Canada Inc.]), David Jones (Mars [Canada Inc.]), Kurt Hatherly (Mars [Canada Inc.]), Marc Morneau [(Hershey) Canada Inc.], Todd Hoffman (Nestle [Canada Inc.]) and Al Kehoe (Nestle [Canada Inc.]).

k. The TAN notices folder contained a "Bulletin #19" dated April 25, 2003, containing the following statement: "We have had considerable discussion on the disfunctionality of 2/99¢ pricing on single bars. Although good progress has been made, please find attached a store outlet and pictures of current such activity at Dollarama. The product in the pictures is fresh, having been shipped and produced in 2003. With a price increase just having been implemented, this situation becomes even more incredible. Please Take Action Now! D.G. Stevens TAN." Bulletin #19 was accompanied by fax cover sheets dated April 24, 2003 from Glenn Stevens to: David Sculthorpe (Adams) [now part of Cadbury Adams Canada Inc.], Yves Dalcourt (Mars [Canada Inc.]), Robinson, Bruce Brown (Hershey [Canada Inc.]), Leonidas, Benin, Robertson; Hall, Mike Vissers (Hershey [Canada Inc.]), Hoffman, Lance Berrisford (Cadbury [Adams Canada Inc.]), Doug Ross (Cadbury [Adams Canada Inc.]), Shawn Allen (Hershey [Canada Inc.]), Kehoe, and David Jones (Mars [Canada Inc.]).

l. The TAN notices folder contained a set of letters from Camille Nadeau of ITWAL dated October 7, 2003 in substantively the same terms. The letters were addressed to sales staff of the particular companies and requested

the presence of persons in leadership positions at an upcoming meeting. Those named in the letters were Dalcourt, Jones, Robinson, Sculthorpe, Berrisford, Hall, Leonidas, Kehoe, Brown, Robertson, and Vissers. The letter from Nadeau to Mars reads: "Yves [Dalcourt]—I would like to request the presence of David Jones and Don Robinson at our upcoming October 28 business review. The reason for their presence would be to discuss the inequity in the Market Place when it comes to keeping the full service distributor competitive with the club & cash & carry activity. It would be ITWAL's position to request that in 2004, all club and cash & carry pricing activities be discontinued. The only activities should be around the value added performance that can be offered by your customers and pricing is not perceived by ITWAL as one of these. Regards, Camille Nadeau, Business Development Manager Retail, Itwal Ltd. CC: Glenn Stevens."

m. Covering the October 7 letters from Nadeau, there were a set of letters dated October 9, 2003 in substantively the same terms, addressed to persons in leadership positions at Cadbury [Adams Canada Inc.], Mars [Canada Inc.], Nestle [Canada Inc.] and Hershey [Canada Inc.] that read: "Dear [particular addressee], Just a quick note to add that I hope you can attend. Together we have to come to grips with this issue or everybody loses! Yours truly, D. Glenn Stevens."

46. Defendants' conspiracy was not limited to their conduct in Canada, but extended into the United States during the same time period. The United States Department of Justice ("DOJ") initiated an investigation into the pricing of chocolate manufacturers, partly on the information being discovered by the separate Canadian government investigation of and for the same Defendants and conduct. "An official at Mars Inc. said it had been contacted by the antitrust division of the Justice Department 'concerning pricing practices in the U.S. chocolate confectionery industry.' The company said it would cooperate." December 21, 2007 edition of the New York Times, *U.S. Investigates Chocolate Makers*.)

47. According to the December 21 Wall Street Journal article, Nestle spokeswoman Laurie MacDonald confirmed: "Nestle USA is aware of a preliminary investigation into the marketing practices in the U.S. chocolate industry. We've not received any document requests, but we plan to cooperate fully with this investigation, and it's our policy to operate ethically and follow all applicable laws and regulations wherever we do business." (December 21, 2007 edition of the Wall Street Journal, *Chocolate Makers Face Probe Over Pricing*.)

48. The article further stated that: "Cadbury spokeswoman Luisa Girotto would neither confirm nor deny whether the London maker of Cadbury Creme Eggs has been contacted by the Justice Department. 'We would, however, fully cooperate in any investigation.' Hershey spokesman Kirk Saville declined to comment."

49. Defendants' unlawful activities in the U.S. are also evidenced by the following price increases that were inconsistent with past pricing practices and are consistent with a conspiracy:

a. On December 9, 2002, Mars (via its Masterfoods USA division) increased wholesale prices on single packs of chocolate bars by approximately 10 percent. A few days later, Hershey announced a price increase (which was implemented on January 1, 2003) for the wholesale price of its domestic standard size, king size, variety pack, 6-pack and 10-pack candy bar lines. The increase raised the price of standard-sized candy bars in particular 10.8%. Hershey spokeswoman Christine Dugan said Hershey raised prices after rival Mars recently raised its prices. Hershey's move represented a break with the past; it had not raised prices on standard-sized candy bars since 1996.

b. In December of 2004, Hershey increased the wholesale prices of approximately half of its domestic confectionery chocolate line. Changes that were effective in January 2005 represented a weighted-average increase of approximately six percent on its standard bar, king-size bar, 6-pack, and vending lines. Changes that were effective in February of 2005 represented a weighted-average price increase of four percent on packaged candy. The price increases announced in December of 2004 represented an average increase of three percent over the entire domestic product line. Hershey's standard candy bars, king-size bars, six-packs and vending candies were to increase by an average of 5.8%, whereas packaged chocolates were to increase by an average of 4.1%. Significantly, Hershey's increase came weeks after Mars (via its

Masterfoods USA division) raised its prices for its corresponding chocolate confectionery products by similar amounts.

c. On March 21, 2007, Hershey announced wholesale price increases of its domestic confectionery chocolate line by about 4-5%, citing the need to help offset costs. Mars (via its Masterfoods USA division), raised prices only two days later, effective March 23, 2007, for the wholesale prices of its chocolate confectionery products by an average of 5%, purportedly due to rising costs, particularly cocoa. Mars's increase raised prices for confectionery single and king-sized chocolate bars of well-known brands including M&Ms, Snickers, Twix, Milky Way and Dove. Mars and Hershey both publicly noted that their previous price increases were more than two years earlier. Nestle also raised prices for its chocolate confectionery products in April 2007 by an average of approximately 5%, purportedly due to rising commodity, packaging and energy costs. Cadbury also raised prices for its chocolate confectionery products around the same time and in similar amounts.

50. Defendants falsely asserted that these price changes were fully justified by increases in component costs. Changes in the price of raw materials for these products do not explain the announced increases in the prices for these products. Rather, these price increases were the product of collusion among Defendants.

51. From at least February 1, 2002 through the present, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of chocolate confectionery products in the United States or for delivery in the United States in unreasonable restraint of interstate trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

**FRAUDULENT CONCEALMENT**

52. Throughout and beyond the conspiracy, Defendants and their co-conspirators affirmatively and actively concealed their unlawful conduct from Plaintiff and the Class. Defendants and their co-conspirators conducted their conspiracy in secret and kept it

mostly within the confines of their higher-level executives. Defendants and their co-conspirators publicly provided pre-textual and false justifications regarding their price increases. Defendants and their co-conspirators conducted their conspiracy in secret, concealed the true nature of their unlawful conduct and acts in furtherance thereof, and actively concealed their activities through various other means and methods to avoid detection. Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws as alleged herein until shortly before this class action litigation was commenced.

53. As a result of the active concealment of the conspiracy by Defendants and their co-conspirators, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## VIOLATIONS ALLEGED

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act)

54. Plaintiff incorporates and re-alleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

55. Beginning at a time presently unknown to Plaintiff, but at least as early as February 1, 2002 and continuing through the present, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for chocolate confectionery products in the United States, in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

56. In formulating and carrying out the alleged agreement, understanding, and conspiracy, the Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

a. To fix, raise, maintain and stabilize the price of chocolate confectionery products;

b. To allocate markets for chocolate confectionery products among themselves;

c. To submit rigged bids for the award and performance of certain contracts for chocolate confectionery products; and

d. To allocate among themselves and collusively reduce the production of chocolate confectionery products.

57. The combination and conspiracy alleged herein has had the following effects, among others:

a. Price competition in the sale of chocolate confectionery products has been restrained, suppressed, and/or eliminated in the United States;

b. Prices for chocolate confectionery products sold by Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels throughout the United States; and

c. Those who purchased chocolate confectionery products, directly or indirectly, from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

58. Plaintiff and the Class have been injured and will continue to be injured by paying more for chocolate confectionery products purchased directly from the Defendants and their co-conspirators than they would have paid and will pay in the absence of the combination and conspiracy.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays:

1. That the Court determine that the claims alleged herein may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure;

2. That the unlawful conduct, contract, conspiracy or combination alleged herein be adjudged and decreed to be a restraint of trade or commerce in violation of Section 1 of the Sherman Act, as alleged in the First Claim for Relief;

3. That a joint and several judgment of damages be entered in favor of Plaintiff and the Class and against the Defendants;

4. That the award of damages be trebled as provided by law;

5. That Plaintiff and the Class be awarded pre- and post-judgment interest, and that that interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

6. That Plaintiff and the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law;

7. That Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from in any manner: (1) continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other conspiracy alleged herein, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect; and (2) communicating or causing to be communicated to any other person engaged in the sale of chocolate confectionery products, information concerning pricing or bids of competitors; and

8. That Plaintiff and the Class have such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

Dated: February 11, 2008

Respectfully submitted,

By: ______________________________

Frederick P. Furth
Henry A. Cirillo
Michael S. Christian
THE FURTH FIRM LLP
225 Bush Street, 15th Floor
San Francisco, CA 94104-4249
Telephone: (415) 433-2070
Facsimile: (415) 982-2076

**JURY TRIAL DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury for all issues so triable.

Dated: February 11, 2008

Respectfully submitted,

By: ______________________________

Frederick P. Furth
Henry A. Cirillo
Michael S. Christian
THE FURTH FIRM LLP
225 Bush Street, 15th Floor
San Francisco, CA 94104-4249
Telephone: (415) 433-2070
Facsimile: (415) 982-2076